My name is Joe Bertogli. I'm the attorney for Mr. Kendrick Page, who was one of eight defendants charged in a one-count conspiracy stemming, beginning in 2001, through and including the date of the indictment, which was in 2019, end of November of 19, which spanned at least three states, Iowa, Illinois, and Texas, if not more, based upon allegations related to a single count of conspiracy to distribute various controlled substances, along with other alleged law violations in those separate states involving drug distribution. Mr. Page, along with two other co-defendants, Mr. Armstrong and Mr. Davis, proceeded to trial, and after a seven-day trial, all three defendants were convicted on a single count of the conspiracy indictment. Mr. Page was subsequently sentenced to 340 months, along with on appeal, I've raised five issues, including the suppression of a wiretap, the failure to give a multiple versus single conspiracy instruction as requested, and three sentencing issues having to do with the application of the guidelines, as well as the last issue having to do with the substantive reasonableness of the sentence. I'm going to focus this morning, based on my limited time, on the suppression issue. Mr. Tingle is going to argue the common issue that he and I have on appeal here, which is the single versus multiple conspiracies instruction issue. So I'm going to leave that argument to his capable hands. First of all, with regards to the wiretap suppression issue, in this case, on two different occasions, the government applied for and received orders to intercept telephone calls relating to one target telephone. I've raised, on appeal here, three issues relating to the appropriateness of the order granting the wiretap and the execution of the wiretap. First of all, Mr. Page asserts that there was insufficient probable cause for him to delineate the relation of his activities or use of the target telephone that was registered and owned by Simone Buchanan in Illinois. Why wasn't the buy that was arranged with Mr. Page sufficient to show that there was a basis for having a belief that there was additional evidence to be obtained through the wiretap? Are you talking about a buy between Mr. Page and whom? It was an informant. I believe that there was a half-pound meth purchase. And was that in Illinois or was that in Iowa or Texas? Well, sir, I'm not exactly certain. I may have the facts incorrect, but I believe there were some transactions or at least a transaction that had been documented prior to the seeking of the wiretap. Am I incorrect on that? You can tell me. I would have to assert that that wasn't correct because my recollection of the vast discovery and the evidence presented at trial was that any transactions between Mr. Page and or others occurred either historically way back in 2001 and 2002 in the state of Louisiana, Texas, and then after he moved to Burlington, Iowa, there was basically other co-conspirators that testified about their transactions that involved transactions with Mr. Page. I want to ask you, I wanted to follow up on the Chiefs. I have the same notes, a little different, that there was, I guess it was with an informant and it talked about the number $2,500, or $2,500, which may have been a reference to a deal taking place the next day. Now, I don't know that Page actually sold the drugs himself, but they got that directly off the confidential informant's phone from the subject or target phone that they got the wiretap on. Yes, I think I detailed the substance of that telephone, either it was a text or conversation. I don't think it was a recorded conversation. I think it was a text or between Mr. Page and I'll identify him as the confidential source number six that talked about the $2,500 and the $2,000. And I think I talked about that, I set it out in detail on pages 16 and 17 of my brief. And I said that Agent Hyland testified at the suppression hearing that that telephone call involved discussing pending methamphetamine transaction. But if you actually look at the guts of who said what, there's no mention of drugs, there's no mention of any sort of code name for drugs that has been alleged previously in the application for the search warrant. That may be true, but I think the next day, as I recall, there was a, and again, I don't remember whether it involved Mr. Page personally, but there was a $2,500 drug transaction that happened the next day. Even if you don't discuss it in the text, wouldn't that provide enough for a probable cause for a wiretap? Well, I don't believe so because I don't believe there was any evidence that Mr. Page was involved in any drug distribution the next day with regards to CHS number six. And the, as I recollected, there wasn't any testimony either at the suppression hearing or at the trial about that transaction occurring or what the details of that transaction were. So, and I may be mistaken, but, and I'm sure that the government will point that out if I am. But moving on, I don't believe that the applications did have enough specificity to comply with the requirement underneath the code section having to do with wiretaps to form the basis of the probable cause. What was missing? What would you say was missing from it? Well, there was, the, what was missing was, was any, any real statements or, or in the affidavit that had to do with Mr. Page's connection to the target telephone number that belonged to Simone Buchanan and his use of that. Other than this cryptic phone conversation that Justice Strass has brought up that's contained in my brief, that's really the only thing that exists. So that's what was missing is anything that would support the reason to obtain an intercept on that target telephone. The minimization and necessity requirements, I believe I've set out minimization. I think the court misinterpreted what we were presenting as a result of the 9,000 phone calls that were intercepted and the phone calls we thought were not minimized. I set that forth in the suppression exhibit. And then the necessity, again, I don't believe that it was necessary that the necessity requirement was met. Thank you. I see my time is up. Chief, could I ask one additional question? Yes. So I just want to ask quickly about the minimization. That is a problem. I'm going to ask the government about it. I think that some of the calls were not properly minimized, a small proportion of them. My question for you is would the good faith exception to the warrant requirement apply to the minimization requirement in the statute? I don't believe so. The good faith defense, yeah. No, because obviously the good faith defense has to do with the reasonable reliance upon the fact that the agent was complying with the law at the time that the alleged violation or failure to meet the requirements of the wiretap statute occurred. I believe that it doesn't apply because it was the government's own actions, not the actions of somebody else that would have caused that violation. Thank you. Thank you. Thank you, Mr. Patoglia. Mr. Tyndall? May it please the court. My name is Eric Tyndall, and it's my honor to be here representing Breon Armstrong. As Mr. Patoglia discussed, the focus of my argument here today is going to be on the theory of defense instruction, the multiple conspiracies instruction, which we had requested in this case. It's long been held that defendants have the right, whether it's a due process right or a compulsory process confrontation right, to present their theory of defense. And this circuit has held that the theory of defense instructions are mandated to be given where there is some evidence to support that instruction. Consistently, this circuit has held that the evidence does not have to be strong, and in fact in some cases can be in conflict with the defendant's own evidence. Don't we also have authority to the effect that if there's a substantial amount of evidence pointing to a single conspiracy, that the district court has the discretion to deny the multiple conspiracy instruction? Absolutely, that's true, Judge Smith. And Burris is an example of that. But in Burris, what's interesting is that the court, although the district court, although it did not give a multiple conspiracies instruction, it did modify the underlying conspiracy instruction to at least allow the defendant to argue it. So although certainly defendants aren't entitled to the specific language of the instruction they're requesting, if there is some evidence that is consistent with the law, the defendant should receive the evidence. And there is no question in this case that multiple conspiracies was at the heart of the defense. It was discussed from opening through cross and through closing. And I think that there's certainly – Well, I did the best I could here, Judge Smith, with the existing conspiracies by saying the defendant wasn't part of this conspiracy. But I think as the circuits pointed out in Christie, the defendant's entitled to have the jury's attention directed in a way that's consistent with the law, which is the multiple conspiracy instruction. that was requested here. And especially in a case like this where Breon Armstrong and Mr. Davis and others who testified came from the same general area of Louisiana. They were associated by geography and by familial relationships. And so in that scenario, I think the defendant should have the opportunity to point to the multiple conspiracies instruction to show that just those relationships alone aren't enough. And that's backed up by additional evidence in this case in which, if you look closely at some of the wiretap discussions that happened, it was clear that Mr. Armstrong and Mr. Page weren't on the same page. In this case, on a number of situations. And so there was at least some evidence to suggest that they were doing their own thing. Certainly, there's evidence that the government has focused on that they were in a single conspiracy. But the issue here is, shouldn't we allow the jury to be able to assess the facts as it applies to that defense? And really, Preece Korn is an excellent example of that. Because in Preece Korn, there was an insufficiency challenge, which was rejected. But it was reversed because the fact of the defense in that case, which was buyer-seller, should have been given to the jury to decide. Counsel, I want to follow up on this point, which is, you noted they're all from the same area. They now live in the same area as well. They interact with each other quite a bit. And my understanding, you brought up Armstrong and Page. But my understanding is, is Page directed Armstrong, or at least he understood this, in terms of trips he made, in terms of particular relationships he made. And so I just wonder whether all of this combined gives good reason for the district court not to give an instruction that might have been confusing to the jury. Judge, I certainly appreciate that that's certainly one way to view the evidence. But there are alternative theories that can be argued. And the challenge isn't whether there's so much evidence concerning the government's theory that the instruction shouldn't be given. The challenge is, is there some evidence? And it can be weak evidence to support the defense. And there was at least sufficient evidence of that to give the defense. Certainly, if we were here, I argued a sufficiency of the evidence argument in my brief, but I'm not really here to emphasize that. Because I think the real issue is, shouldn't the jury have been able to understand that under the multiple conspiracies law that's good in this district? I'll reserve the balance of my time for rebuttal. Thank you. Thank you, Mr. Tyndall. Mr. Leffel. Good morning, Your Honors. William Leffel. I am the attorney for Tristan Davis. The issues that I had raised in my brief are not questions of law. They're fact-based. With respect to the sufficiency of evidence, that is set out in the briefs. And I will not argue that further in the five minutes that I have. So I'd like to focus my argument regarding the application of various guideline enhancements for regarding the weight of the drugs, the supremacist enhancement, and the denial of the request that I made that Mr. Davis be assessed a minor role in this offense. I think that this all comes down to a question of just how deeply was Tristan Davis involved in the conspiracy that the government presented the evidence of? Was the district court clearly in error in finding that he was deeply involved? Finding that he had been deeply involved for a almost 20-year period of time informed the court's decisions as to whether it was reasonably foreseeable that other amounts of methamphetamine and crack cocaine should be attributable to him, other than amounts that he directly delivered himself, which I think were only a few grams. And whether the premises enhancement should apply to him when the evidence that was secured in the search warrant and through the wiretaps did not point to him directly, no drugs were found, pointed to criminal conduct perhaps of others, co-defendants in, say, storing some ice methamphetamine on top of a refrigerator, which Mr. Davis would have thrown in the bushes, and the receipt of a package which may or may not have had some drugs in it when the search warrant was executed, or drug residue, excuse me. What could the district court make of language that Davis' house was used as a base of operations? They was used for the, yes, yes, Your Honor, that was a finding that was made. I am arguing, of course, that that was clear error. There were never any drugs whatsoever. What in the record would tell us that the district court clearly erred in reaching that conclusion? Yes, the standard of review is clear error for all the points that I bring up. In addition, Your Honor, since I'm arguing that since he was not deeply involved and there was a lack of what would have been reasonably foreseeable, then with respect to the weight, the record, I'm arguing the record definitively and firmly illustrates that the district court made a mistake in attributing over 10 pounds of weight to him. Now, at several points in the government's brief, they argue, and they argue this several times, that the court should find him deeply involved because he was a member of the conspiracy from the beginning. He was involved in bringing drugs from California. He collected a drug debt, worked extremely closely with Page. The wealth of the evidence that the government presented at trial actually cut against that. They presented the testimony of others, such as David Davis and Wilbur Bowers, who had been involved on a regular basis since the beginning of the conspiracy. And as Mr. Davis said, he'd never seen Tristan do anything wrong. He really didn't know what Mr. Davis did. With respect to Mr. Bowers, also a lack of any specific drug-dealing activity, and Mr. Bowers said he didn't deal. He really didn't know what the lower-level people did. So, if anything, Mr. Davis was lower-level. In the 10 seconds I have left, I'll just quickly address the drug delivery. I would say that that controlled payoff was, as shown on page 439, you had one guy go, you had the Philip Jones go to the house of Mr. Page, expecting to find Mr. Page there. He went there as directed by Detective Plain. When he didn't find Page there, as the transcript exhibits 36 and 37 shows, he just started handing over money. I would not characterize that as a drug payoff. Okay, thank you. Thank you, Mr. Leffel. Ms. Glasgow for the government. Thank you, Your Honor. May it please the Court, my name is Andrea Glasgow, and I represent the United States in this case. Beginning first with the pretrial issues, part of this case involved a Title III application to the Central District of Illinois, to Chief Judge Darrow over there. That application and affidavit, both the initial application and affidavit and the renewal, contained extensive probable cause about the investigation of Mr. Page and his associates. It did contain information about controlled purchases made through the use of the target telephone number one. Now, information contained both in the affidavit and at trial was that Mr. Page was very careful about his phone calls. He instructed others to be careful about their use of the phone. So there was not a phone call that said, yes, Mr. Jones, I would like to set up a half-pound methamphetamine purchase with you tomorrow for $2,500. Those words were never said. That's true. There was a phone call which set up the deal, and according to the CS, who was Mr. Jones who testified at trial, that deal then took place the next day based upon his communications with Mr. Page. He, in fact, testified at trial, and it is contained in the affidavit, that during the summer of 2019 leading up to the application in September of 2019, there were multiple controlled purchases set up through the Page organization. Those phone calls, or excuse me, those buys would take place by him communicating with Kendrick Page. On occasions, he would send someone else. That, again, is outlined in the affidavit. That application and affidavit was reviewed by myself, the supervising United States attorney. That application and affidavit was then sent and reviewed by the Deputy Attorney General and was reviewed by Chief Judge Darrow in the Central District. Then again, at suppression, it was reviewed by Chief Judge Jarvie, or then Chief Judge Jarvie, in the Southern District of Iowa. At all four levels, both reviewed by two federal prosecutors and reviewed by two federal judges, everyone has found sufficient probable cause and necessity, which I'll address a little in a moment. Well, would you go ahead? I don't think there's that much controversy on the existence of probable cause. Okay. Would you go ahead and address the concern for minimization? Yes, Your Honor. Turning then to minimization, Judge Strauss had brought up whether good faith applies to minimization. One point I'd like to clarify, and I think it got a little confused at the suppression hearing, but I think Judge Jarvie eventually saw what we were discussing, is I think part of the confusion initially is that the phone calls, the way that the FBI recording system takes place is that recorded phone calls are a continuous audio recording. So when minimization occurs, the agents essentially press a stop recording button, they wait, and when they go back into spot check, they press start again. So the audio portion that is in fact recorded is continuous, but when you look at the call sheet, you can see that a call, total time of a call would be, for example, 15 minutes, and the recorded time would be, for example, 8 minutes. Now, when you listen to the recording, you're not going to hear big gaps of time because they simply stopped recording. There's not dead air. And I think that was part of the confusion that was cleared up during the testimony of the agents at the suppression hearing, that of the calls that Mr. Bertogli thought were never minimized, in fact, 203 of them were minimized. Several of the calls were discussing, in fact, criminal activity. And importantly, the requirement of minimization is just that. It's minimization. It's minimizing the interception of contact that does not involve criminal activity. It is not a prohibition against listening to all contact that does not involve criminal activity. And the standard of review is obviously taking an objective assessment of an officer's actions and minimization in light of the facts and circumstances then known to him and determine whether the officer's actions were reasonable. So the assessment here- Counsel, can I just interrupt you? And it gets to the root of my question I asked the opposing counsel, which is my understanding is that there were a real minority. Like, we're talking about maybe less than 1% of the calls. At least there's some dispute about whether they were properly minimized and whether the officers followed their own procedures. Am I wrong about that? Your Honor, by my calculations, I have- Mr. Bertogli pointed out 230 calls that were not minimized according to him. Of those calls, 203 were, in fact, minimized. Several of the calls were under 3 minutes in total length duration. And the length of the call duration includes, like, some dead air time when it's ringing. And the minimization requirement put in place by Judge Darrow was minimized within the first 2 minutes of contact. So it's our argument that some of those 3-minute calls would have, in fact, been within 2 minutes of contact. And several of the calls- So of 27 calls, several of them, which is outlined in our suppression hearing exhibit, in fact, discuss criminal activity. And so the- We do not concede that there was any improper minimization, but to the extent that there may be interceptions that were not related to criminal activity, that doesn't equate to improper minimization. Because the role of the agent was to listen to the conversation and determine whether criminal conduct was being discussed. That was made difficult in this case by the fact that Mr. Page was routinely using both his wife, his girlfriend, his nephew, who is, in fact, Breonn Armstrong, another of his nephews, his cousin, James Miles Punkin, who is discussed extensively about his involvement. The fact that he was routinely using friends and close family members, including those who are in his immediate vicinity, made it difficult for them to say, okay, this is a call with his wife. We don't need to listen. And so that's part of the assessment, then, is based upon the totality of the investigation, what's been intercepted to date. The officer has to act reasonably in determining whether this call or particular parts of a call are a discussion of criminal activity. Well, let me ask you this. So if there's a total of, I think there were 10,000 calls, and let's say some of those 30, I think you said there were 30 of them that might have fallen in the three-minute, et cetera, that are a little bit unclear. But even if the government, even if the agents made a mistake as to those 30, is there a substantial compliance-like requirement or standard that applies in this area, or is it like strict liability? You mess up on the minimization, the wiretap is out. No, Your Honor. I believe it is substantial compliance. And, again, the term minimization, I think, in itself indicates that. The statute and the term, it's minimization. It's not no listening whatsoever. And I think that's the part where, two, the reports to the court, the reports to Judge Darrow at a timely interval, and then the process of both my meeting and my memorandum to the agents, their requirement to participate in those or view them, their requirements to review the affidavit and the application prior to any participation in interception. All of that is done in an attempt to make sure that minimization is done appropriately. But, again, it's minimization. And the two-minute or the three-minute, that's not a statutory issue. It's more of these are efforts put in place to attempt to make sure that we are complying with the statute, which, again, requires minimization, not a total denial of ever listening to something that's not criminal-related. And, again, the standard is whether the officers acting based upon their knowledge at that time, whether they were acting reasonably. Turning then to the trial issues, it's the government's position that the limit or the instruction on multiple conspiracies really is a sufficiency argument in this case. The evidence at trial was very consistent, as Judge Jarvie noted. The conspiracy involved consistent players, consistent participants over approximately 20 years. Witnesses testified, including David Davis. David Davis was a witness who testified that he had grown up in Burlington with Mr. Page. They went to high school together, and they began dealing drugs not long after they graduated high school in the early 2000s. He testified that Mr. Page, in fact, told him that he, Mr. Page, had brought up Tristan Davis, who's often referred to as Trey, from Shreveport, Louisiana, to deal drugs with them in an effort to insulate himself so that Mr. Page was not dealing directly with so many customers and having liability himself. That testimony was then corroborated and consistent throughout the other testimony and throughout the wiretaps. Wilbert Bowers was another witness who testified that he grew up in Shreveport, Louisiana, that Mr. Page recruited him to come to Burlington, Iowa, to sell drugs for him. The testimony was consistent that this conspiracy started with the distribution of crack cocaine in the early 2000s, and that by around 2015, 2016, the conspiracy had shifted to also distributing ice methamphetamine. Keith Nash testified. Was the evidence such that the players all stayed the same, even though they shifted the product? Yes. You know, one of the arguments that was made was that Brionne Armstrong, this wasn't a single conspiracy because Brionne Armstrong was approximately 20 or 21 at the time and obviously would not have been initiated in this conspiracy when he was born. The government does not argue that. But the core group of participants, Mr. Page, Trey Tristan Davis, there were several others, including James Miles, often referred to as Punkin, Alfonso Edmond, a charged co-conspirator, often referred to as Money or Big Head. All of those players were consistently involved over the time frame that was included. Given the length of the time frame, isn't it conceivable that there could have been multiple conspiracies involving the same persons where the conspiracy ended for some period of time and resumed? Or is that considered the same conspiracy? Your Honor, I think as a theoretical matter, it is possible. I think it's not consistent with the evidence presented at trial. The evidence presented at trial Why isn't that sufficient to enable the defense to get its preferred instruction to the jury? Because the initial inquiry, Your Honor, is whether it's factually supported. So not whether it's a theoretical possibility, but whether the evidence presented at trial supports that that was factually what occurred and there was no evidence whatsoever that there was any more than one conspiracy. And in fact, none of the defendants, Mr. Page nor Mr. Armstrong on this appeal, have in fact pointed to any evidence that there were distinct conspiracies. This was one group of core individuals. Yes, members were added. Breon Armstrong was very young. He was 20 or 21, as I suggested at the time. So he came in much later. That was what the evidence showed. Frederick Reed also testified at trial. He testified that he was also recruited from Shreveport and came up. Alfonso Edmond, another charged co-conspirator, was his brother's father and had recruited him to come to Burlington. And so the evidence certainly was that members were being added, but that the activities of the group, the methods of the group, the leadership of the group all was very consistent over 20 years. And Judge Darby addressed that somewhat in his ruling. And he said the length of time is the one factor that would give him pause. But he pointed to the trial evidence, which shows that even over this length of period of time, even over 20 years, the evidence and the witnesses consistently showed that this was an organized group with the same membership, the same methods of practice. Yes, they evolved somewhat, but the core methods of practice didn't change. And one of the pieces of evidence that supported that was their practice with the phone. There was evidence early on in the trial that crack cocaine users would call what they referred to as a, quote, crack phone. That that was a phone that they knew would obtain them drugs from Kendrick Page, crack from Kendrick Page. They testified that frequently people such as Big Head, Alfonso Edmond, Tristan Davis, and others would in fact deliver the crack cocaine to them, but they knew it was all coming from Kendrick Page. Frederick Reed then, who was also young like Mr. Armstrong, talked about and testified at trial. He was a charged co-conspirator. He testified that he had been recruited to come up from Shreveport, that when he got to Burlington, Alfonso Edmond immediately introduced him to Mr. Page, and that not long after being introduced to Mr. Page, he was given responsibility of dealing with the crack phone. He was instructed and told that these are the people who call. They just call and say, will you come see me? And you go and deliver. He was told by Mr. Page who to deliver to, how much to deliver, and for what price. Can I ask a question about the standard of review we should apply to this question, the multiple conspiracies instruction? Both your brief and Armstrong's say abuse of discretion. Page, on the other hand, cites the Brugiere case and says de novo because it simultaneously denies a legal defense. So what standard of review should we apply to this question? Your Honor, it's our position that the standard of review is abuse of discretion. In preparing for this argument, I did note that there has been some inconsistency of the application of the standard of review in this area, but I think it has more to do with the facts. If you think about the denial of a jury instruction, that is typically abuse of discretion. The preliminary question, though, is, is the instruction factually supported? And I think where we get more of the, we're getting closer to de novo review is a denial of defense. But the initial question is, is it supported by the facts? And if the facts do not support an instruction, then there's no argument that it's denying a defense because it's not factually supported. If there's some dispute about whether the facts support it and then the judge refused to give it, that's when I think we get closer to de novo review. But regardless of the standard of review, in this case, it was not factually supported. And the second question, then, is whether the instructions as given, taken as a whole, accurately established the law or informed the jury of the law. And it was brought up earlier about whether the defendants were then allowed to argue multiple conspiracies. This was specifically discussed with the district court. They were told that they couldn't argue some other conspiracy, but that they certainly were within their right to argue that their defendants were not part of this charged conspiracy. And that's the ultimate question. The case law is clear that when a conspirator is a part of the charged conspiracy and also a part of a second conspiracy, that the evidence, the concern is spillover, right? And when a member is actually a member of the charged conspiracy and also a member of a second conspiracy, the risk of prejudice is minimal. That's what the case law suggests, that there's little to no risk of prejudice because they were, in fact, a member of the charged conspiracy. And that's what I was getting at when I initially started, that these arguments that they're making are not really that they were in a part of a different conspiracy. Their arguments are that we didn't prove that they were part of the charged conspiracy. And the instructions that Judge Jarvie gave, both the marshalling instruction and his definitions of agreement and things like that, explained to the jury that it was the government's burden to prove that each of these individuals was a member of the charged conspiracy and that if we did not prove that they were a member of the charged conspiracy, they needed to find them not guilty. And that's why in this case, given the facts, the multiple conspiracy instruction was not appropriate and Judge Jarvie's instructions given, taken as a whole, did appropriately recite the law and allowed the defendants to make their arguments on the defense that they were not part of this charged conspiracy. Counsel, isn't that a little circular though? I mean, I think they would come back and say, and I'll just make the argument for them, they'd say, well, I was trying to prove that my client was not part of the charged conspiracy because he was part of a different conspiracy. And by not allowing me to say that there was a different conspiracy or multiple conspiracies, I couldn't prove, I was denied a defense, I couldn't prove that he wasn't a member of this conspiracy. That's, I think, what they would come back and say. And so, is it all tied together really? I mean, whether he's a member of the charged conspiracy and whether they're a member of a different conspiracy are all tied together in the way this case was tried. Your Honor, I understand your point. I think the distinction that I see is, and I think part of the difficulty in talking about this is there's very, I mean, in fact, no case law that the multiple conspiracies instruction has been improperly denied. All of the case law that was cited is the Eighth Circuit affirming the district court's denial of the multiple conspiracies instruction, particularly in the drug context. In the drug context, you know, the case law in multiple conspiracies is, for example, robberies and murders or something. And so, I think that there is a difference of Kendrick Page standing up and saying, I did not agree with Tristan Davis and Breonna Armstrong to distribute drugs. I wasn't part of this conspiracy. Now, the multiple conspiracies allows him to say, well, yes, I agreed with this person and I agreed with this person. But you can still argue that I didn't join in an agreement with these two people. And I think that one of the best points of evidence that this is a single conspiracy did come from the wiretap. There was a phone call, an intercepted number of phone calls back and forth in October of 2019. The initial call is from Breonna Armstrong to Kendrick Page. And Mr. Armstrong asked Mr. Page what Trey, Tristan Davis, did with the, quote, clear shit that was at his house because he has one on the line, meaning he has a drug deal and he needs the ice methamphetamine. Kendrick Page told him he was going to contact Mr. Davis and get back to him. We then had another intercepted phone call. Approximately a half an hour later, Breonna Armstrong calls Mr. Page back. And in that phone call, you can hear Mr. Davis and Mr. Page talking in the background. Mr. Page says, Trey, Trey, what did you do with that clear shit that was on your fridge? Nephew needs it. Nephew being Mr. Armstrong. And then there's a conversation about Mr. Davis hiding it in the bushes. Law enforcement goes over to Mr. Davis' house, the Garnett Street house, which, again, is the basis of the premises enhancement for Mr. Davis. And they find Mr. Armstrong looking in the yard. Now, there was testimony at trial that given the nature of this residence, it was difficult for officers to conduct surveillance because they didn't want to blow the wiretap. They didn't want them to know they were listening to their calls. So they had to make it look nonchalant that they were driving past. But all of that evidence, again, shows that these three individuals had an agreement. And the evidence at trial, the facts before the court at trial were that this agreement had been consistent. And the mere addition of participants, such as Mr. Armstrong or Mr. Reed, does not transform it into a different conspiracy. We look at the actual evidence. Suppose a different case, and I'm going to change it just slightly, but take away a lot of that evidence. Suppose that, I mean, it's one thing to argue I'm not a member of this conspiracy. But if the government's trying to prove that you deal drugs, one way to prove that I'm not a member of this conspiracy is maybe I was dealing drugs or involved with drugs, not dealing drugs, but involved with drugs with some other conspiracy. Why is that wrong? And maybe the evidence doesn't support it in this case. But it seems to me like there is a place for multiple conspiracy instruction in some circumstances. If I may respond, Your Honor. Yes, you may. Your Honor, I think that that is, in fact, what was allowed here. And you didn't need to instruct the jury about that because the court instructed the jury that Mr. Page, Mr. Armstrong, and Mr. Davis had to be members of this charged conspiracy. And Mr. Page specifically stood up during closing and said, yes, I dealt drugs, but I wasn't a member of this conspiracy. That's exactly what he was allowed to do within the parameters of the instructions given. And so, again, I think that the instructions given by Judge Jarvie sufficiently stated the law, accurately stated the law, and still allowed the defendants their theory of defense. If there are no further questions, I'll stop. Thank you. Thank you, Ms. Glasgow. Mr. Patella, you used all of your time in your first round, but we asked you quite a few questions. So we'll give you a minute of rebuttal. If you've heard something you feel the necessity to respond to. On the multiple versus single conspiracies, I believe that Judge Strass has adequately identified the culprit here. What's the standard of review? I allege and maintain that the standard of review is de novo because of the involvement of a multiple conspiracy simultaneously being the same as the theory of the defense by the Senate. But Ms. Glasgow points out that you were each allowed to argue, I may have dealt drugs, but I wasn't part of this particular conspiracy. So were you really denied your theory of defense? Well, what we were denied was the acknowledgement by the court that that's a valid theory with a supporting instruction to point to during final argument. It's one thing to argue I wasn't part of this conspiracy. It's another thing to argue that's wrong. Wait a minute. Let me finish the question. The instruction said your client had to be part of this conspiracy to be convicted. And you were able to argue he may have dealt drugs, but he wasn't part of this conspiracy. So I don't see how you were denied your theory of defense. Because the jury was not afforded the instruction about what to do if they found that there were multiple conspiracies that overlapped into the single conspiracy charged by the government. That's my position, is that they weren't allowed the law and instruction to rely upon. Thank you. Thank you, Mr. Patokma. Mr. Tindall. I see you only have 16 seconds, so I'll be brief. Mr. Armstrong. If you fill out a minute, I'm sure that won't be difficult for you. All right. Mr. Armstrong was actually 18 years old at the time of these events. His involvement was a matter of weeks, not months or years. I would say that I disagree that there is no evidence whatsoever. I would point to document 450 in the record, which lays out some of the issues that we raise to the trial court of the facts that support the multiple conspiracies instruction. I think the heart of it is the defendant's entitled to the instruction that must be sufficiently precise and specific to enable the jury to recognize and understand the defense theory. That's what Christie said. And just arguing off of the general conspiracy instruction doesn't do it. That's why we have a stock multiple conspiracies instruction. And I'll leave with Priest-Korn, which says that we leave to the jury the task of evaluating the facts and the adequacy of the appellant's theory of defense. And what happened here was the court took that away from us. And we would argue that that's abuse of discretion and requires reversal. Thank you. Thank you, Mr. Tyndall. Mr. Davis, do you wish to use any rebuttal time? No, Your Honor. All right. Okay. Thank you, all of the attorneys who have presented to the court this morning. We appreciate the arguments you've presented in supplementation to the briefing, and we will take the case under advisement. I also wish to acknowledge that the appellant's counsels are appointed under the Criminal Justice Act, and we express our gratitude to you for your willingness to serve in that capacity. Thank you.